***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into as a Pretrial Agreement on 21 March 2001, by the parties at the hearing before the Deputy Commissioner, and by subsequent stipulation of the parties, as:
 STIPULATIONS
1. The date of the injury that is the subject of this claim is 17 February 1998.
2. On such date the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. On such date an employer-employee relationship existed between plaintiff and defendant, and defendant was insured for workers' compensation benefits.
4. Plaintiff's average weekly wage for purposes of this action is $628.00, yielding a compensation rate of $418.67.
5. Defendant has admitted liability for plaintiff's injuries and has filed a Form 60 to that effect.
6. Defendant has paid plaintiff temporary total disability benefits in the amount of $418.67 per week since 18 February 1998.
7. In approximately July or August 1999, defendant paid plaintiff's mother, Ms. Evangeline Hall, $19,000.00 for providing attendant care services to plaintiff through a date in September 1998.
8. Plaintiff is permanently and totally disabled under the Act.
 ***********
Based upon all of the competent, credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was employed as a child protective services caseworker for Wake County Social Services.
2. On 17 February 1998, plaintiff sustained catastrophic injuries including spinal cord injury, paraplegia and brain injury when she was involved in an automobile accident resulting in her ejection from the vehicle onto the roadway.
3. At the time of her accident, plaintiff was on her way to Court to deliver a report to her supervisor. Defendant accepted liability for plaintiff's injuries and has now stipulated that plaintiff is permanently and totally disabled.
4. Following her accident on 17 February 1998, plaintiff was transported by ambulance to Wake Medical Center where she was treated for a T8-9 spinal fracture/dislocation with significant spinal canal compromise, right sided transverse process fractures of the spine involving each level between T5 and T9, right sided fractures of the 7th, 8th and 9th ribs, and contusional hemorrhages involving the brain's left temporal lobe and left posterior frontal-anterior parietal junction, among other injuries.
5. On 25 February 1998, plaintiff underwent open reduction of T8-9 fracture subluxation, posterior spinal fusion T5-12, posterior spinal stabilization T5-12, and harvesting of left posterior lilac crest bone graft. Plaintiff was discharged from Wake Medical Center hospital to Wake Medical Rehabilitation for inpatient therapy on 5 March 1998, with no hope of recovering spinal function.
6. On 22 April 1998, plaintiff was discharged from Wake Medical Rehabilitation with paraplegia and cognitive deficits.
7. Plaintiff was discharged to live in her mother's home, which defendant had not then modified to accommodate plaintiff's disability.
8. Plaintiff continued regular outpatient treatment and therapy at Wake Medical Rehabilitation, under the care and direction of board certified physiatrist Patrick O'Brien, M.D. Since her accident, other authorized physicians, all of whose treatment is further described in plaintiff's Life Care Plan, have also followed plaintiff. Dr. O'Brien has remained plaintiff's principal authorized treating physician to the present date.
9. In May 1998, plaintiff began to experience signs of severe depression and episodes of panic/anxiety attacks. On 24 June 1998, plaintiff began treatment with David P. Zarzar, M.D., psychiatrist, for medication management to control her panic attacks and depression.
10. On 9 June 1998, plaintiff underwent neuropsychological assessment where she was assessed with a mild cognitive disorder.
11. In August 1998, plaintiff began experiencing severe pain and spasm in her back and lower extremities. She was treated with a TENS unit.
12. On 27 August 1998, plaintiff was discharged from Wake Medical Rehabilitation's day program.
13. On 8 September 1998, Dr. O'Brien recommended that plaintiff's home be modified to make it accessible for her, that she be provided with accessible transportation including a lift for independent mobility in the community, and that she be provided with an electric hospital bed and ongoing attendant care services until accessibility modifications were completed.
14. Plaintiff continued to undergo physical therapy through Wake Medical Center following her discharge from the day program. Her symptoms of anxiety were controlled with medication, although she continued to experience bouts of depression. She also experienced ongoing spasticity in her lower extremities.
15. On 6 November 1998, plaintiff was discharged from outpatient physical therapy. It was recommended that she undergo insertion of an intrathecal baclofen pump to dispense a solution of baclofen, morphine, clonidine and bupivacaine for intractable spasticity. Surgical implantation of the pump was delayed after plaintiff inadvertently burned her thigh with a curling iron and required a full thickness skin graft performed on 24 November 1998.
16. On 28 December 1998, plaintiff was admitted to the emergency room at Wake Medical Center following a full Tonic-Clonic seizure involving the upper extremities. She was started on oral Tegretol.
17. On 8 January 1999, plaintiff underwent surgical insertion of an intrathecal Baclofen pump in an effort to remedy her intractable spasticity.
18. In February 1999, plaintiff reported increasing headaches and depression. Dr. O'Brien noted that her wheelchair skills had declined since she was last assessed in August 1998. Plaintiff began another course of physical therapy to develop her wheelchair skills. An MRI of the brain was ordered for further evaluation of plaintiff's headaches, which revealed encephalomalacia of the left temporal frontal region at the site of the prior contusional hemorrhage.
19. On 27 February 1999, plaintiff was again admitted to the emergency room following a seizure. She was placed on Dilantin.
20. On 26 March 1999, plaintiff was discharged from physical therapy complaining of severe back pain interfering with her ability to ambulate effectively by wheelchair.
21. On 1 April 1999, plaintiff underwent removal of posterior thoracic spinal hardware for relief of back pain.
22. Plaintiff subsequently developed a sacral decubitis ulcer for which she underwent debridement on 28 April 1999. On 5 May 1999, plaintiff underwent further debridement of the sacral decubitis ulcer, along with an ostectomy and closure employing a right gluteal VY myocutaneous advancement flap.
23. On 3 August 1999, plaintiff was admitted to the Shepherd Center's day program in Atlanta, Georgia for assistance with her functional impairments, including decreased mobility, neurogenic bowel and bladder impairments, and seizures. During plaintiff's admission, she was noted to have severe bladder incontinence. After numerous methods of trying to control bladder incontinence failed, it was recommended that she undergo bladder augmentation.
24. On 10 September 1999, plaintiff underwent open reduction and internal fixation of a right hip fracture after a fall in her apartment.
25. On 8 October 1999, plaintiff underwent augmentation ileocystoplasty and incidental appendectomy for her neurogenic bladder. She subsequently experienced recurring urinary tract infections.
26. On 11 December 1999, plaintiff was admitted to Wake Medical Center for nausea and vomiting. She was discharged from the hospital on 25 December 1999, after recovering from complications arising out of medication administration.
27. On 12 January 2000, plaintiff began pain management through Richard Rauck, M.D., at Medical Park Pain Management Center in Winston-Salem, North Carolina.
28. On 1 February 2000, plaintiff was admitted to Medical Park Hospital in Winston-Salem for administration of Clonodine due to increasing pain and spasticity. She was discharged on 6 February 2000, after her medication was stabilized.
29. Plaintiff continued to be monitored by Dr. O'Brien for chronic pain and pain management medication. Her symptoms initially improved after the administration of medication via her implanted baclofen pump, allowing her to taper off of her oral pain medication. By mid-2000, however, her pain symptoms had again increased, requiring higher doses of medication, and the addition of Duragesic patches.
30. On 27 June 2000, plaintiff's treating psychiatrist, Dr. Zarzar, noted continuing problems with anxiety. On that date and again on 20 July 2000, Dr. Zarzar indicated that plaintiff's living situation in a home not accommodated to her, including her dependency on her mother and lack of privacy, was the greatest cause of her anxiety.
31. On 30 March 2001, Dr. O'Brien provided plaintiff with a written prescription for a driving evaluation.
32. On 27 April 2001, plaintiff passed her driving evaluation. Dr. O'Brian noted that it would be impossible for plaintiff to transfer in and out of a car, and that she would require an adaptive van. Dr. O'Brien determined that plaintiff would not be able to return to any type of work due to her chronic pain.
33. By 7 May 2001, plaintiff's emotional condition worsened and she resumed psychiatric treatment with Dr. Zarzar. She expressed significant depression and frustration over her inability to acquire the prescribed care that would most help her to live her life as she was once accustomed.
34. On 23 May 2001, Dr. Zarzar wrote to plaintiff's attorneys to state that he was again treating plaintiff's depression with "biological, psychological, and social interventions . . ." which "include a patient trying to return to their predepressed levels of activity." Dr. Zarzar went on to state that for plaintiff, re-engaging in activities outside the home ". . . is very important for the treatment of her depression. . . ."
35. Beginning in February 2001, Cynthia L. Wilhelm, Ph.D., began preparing a comprehensive Life Care Plan for Plaintiff based, inter alia, on multiple interviews of plaintiff and her authorized treating physiatrist, Dr. O'Brien, and on an extensive evaluation of Plaintiff's medical records, medical history and treatment. Dr. Wilhelm's Life Care Plan was finalized on 21 June 2001.
36. The Life Care Plan prepared by Dr. Wilhelm for plaintiff is necessary to assist the Commission in evaluating plaintiff's present and future medical needs arising from her catastrophic injuries.
37. On 21 June 2001, Dr. O'Brien reviewed and approved plaintiff's Life Care Plan as prepared by Dr. Wilhelm, including the medical care, medical equipment, medication, medical supplies and Supportive Attendant Care (Option No. I) described and recommended in the Plan. Dr. O'Brien later testified that the items of care specified in plaintiff's Life Care Plan were necessary to a reasonable degree of medical certainty, and he agreed that the items of care presently recommended were "very conservative estimates."
38. Plaintiff tendered Dr. Wilhelm as an expert in rehabilitation psychology and life care planning and defendant stated that it had no objection to plaintiff's tender. Plaintiff tendered Dr. O'Brien as an expert in physical medicine and rehabilitation and defendant stated that it had no objection to plaintiff's tender. Dr. O'Brien is board certified in rehabilitation medicine, is the Director of the Wake Medical Rehabilitation Institute, and has considerable experience and expertise in treating catastrophic spinal and brain injury patients.
 Medical Care
39. Plaintiff's present and future medical needs include the following medical care:
(a) 12-24 treating visits per year with her rehabilitative medicine physiatrist;
(b) Two treating visits per year with her urologist;
(c) One visit per year for cystoscopy, renal ultrasound, x-rays, etc.;
(d) As needed visits for urological analysis/culture/additional tests;
(e) One time per year physical therapy evaluation;
(f) Two times per week for six months physical therapy treatment;
(g) Two times per week for three months occupational therapy;
(h) RN supervision, one time per month;
(i) Psychological management/treatment, one time per week for one year and then one time per month;
(j) Psychiatric medication management, once every two to three months;
(k) Rehabilitation case manager, one to two times per month; and
(l) One recreational therapy evaluation.
These medical care needs, specified on pages 90-91 of Plaintiff's Life Care Plan, arise from plaintiff's compensable, catastrophic injuries. This care is medically necessary and reasonably required to effect a cure or provide relief for plaintiff.
 Medical Equipment
40. Plaintiff's present and future medical needs include the following medical equipment, to be replaced and maintained as noted:
(a) Power wheelchair with highlift, to be replaced every five years, with maintenance yearly;
(b) Manual wheelchair with adaptation to be replaced every five years, with maintenance yearly;
(c) Plastic coated hand rims for manual wheelchair, replaced two times per year;
(d) Roho or Jay wheelchair cushion replaced every three years;
(e) Wheelchair carry pocket replaced every three years;
(f) Vander lifter, purchased once only and with slings replaced four times over life;
(g) Shower/commode wheelchair replaced every four to five years, with maintenance yearly;
(h) Baclofen pump, replaced one to two times;
(i) Tub bench replaced every three to five years;
(j) Raised toilet seat replaced every three to five years;
(k) Arm rests or rails for toilet replaced every three to five years;
(l) Grab bars for tub replaced every three to five years;
(m) Adjustable hand-held shower replaced every three to five years;
(n) Long-handle mirror for skin care, two times per year;
(o) Long-handle sponge, two times per year;
(p) Reacher, once per year;
(q) Transfer board, once per year;
(r) Portable ramp, two times only over life;
(s) Weight machine, one time only;
(t) Leg exerciser replaced every seven to ten years; and
(u) Electric hospital bed replaced every ten years.
Plaintiff's need for this medical equipment, specified on pages 92-93 of her Life Care Plan, arises from her compensable, catastrophic injuries. This equipment is medically necessary and reasonably required to effect a cure or provide relief for plaintiff.
 Medication and Medical Supplies
41. Plaintiff's present and future medical needs include the following medications and medical supplies:
(a) Triamterene, daily;
(b) Trazadone, daily;
(c) Celebrex, daily;
(d) Isomet/DCHL, daily;
(e) Neurontin, daily;
(f) Cipro, as needed;
(g) Promethazine, daily;
(h) Celexa, daily;
(i) Hydrocodone/APAP, daily;
(j) Duragesic, every three days;
(k) Lortab, daily;
(l) Dulcolax suppositories, daily;
(m) Baclofen pump medication/supplies, monthly;
(n) Catheters, daily;
(o) Kens Underpads;
(p) Latex gloves, daily;
(q) K-Y Jelly, daily;
(r) Attends/Depends, daily;
(s) Wipes, daily; and
(t) Additional supplies (stool softener, Ibuprofen, vitamins, over-the-counter), daily.
These medications and medical supplies, specified on pages 99-100 of plaintiff's Life Care Plan, arise from plaintiff's compensable, catastrophic injuries. These medications and medical supplies are medically necessary and reasonably required to effect a cure or provide relief for plaintiff.
 Supportive Attendant Care
42. Plaintiff's present and future medical needs include supportive/attendant care delivered by a Certified Nurse Assistance (CNA) for six to eight hours per day from ages 38-50 years; eight to ten hours a day from ages 51-64 years; and 18 to 24 hours per day from ages 65 years through her life expectancy. This schedule of attendant care is specified as Option I on page 95 of plaintiff's Life Care Plan. These supportive/attendant care needs arise from plaintiff's compensable, catastrophic injuries, and are medically necessary and reasonably required to effect a cure or provide relief for plaintiff.
 Architecturally Accessible Housing
43. Plaintiff's home environment requires the following architectural and design accommodations: accessible ramping, light and environmental controls, floor coverings, hallways, doorways, covered parking/attached garage, kitchen sinks/fixtures, cabinets, appliances, window changes, electric safety doors, intercom system, bathroom sink, cabinets, roll-in shower, temperature control guards, heater, fixtures, door handles, additional electrical outlets, therapy/equipment storage, and additional space throughout the entire home for wheelchair accessibility. These accessibility needs are specified on page 96 of plaintiff's Life Care Plan. Plaintiff's need for architecturally accessible housing with these features arises from her compensable, catastrophic injuries, and is medically necessary and reasonably required to effect a cure, provide relief and improve her rehabilitation from her injuries.
44. Since her discharge from the hospital after her accident, plaintiff has lived in the Raleigh home owned and occupied by her mother, Ms. Evangeline Hall. Ms. Hall's home has not been modified by defendant to make it accessible, other than by defendant's installation of a ramp to one exit and the widening of one bathroom door. Modification of Ms. Hall's home to accommodate plaintiff is no longer practicable due to all of the facts found herein, and is no longer desired by plaintiff. The testimony at hearing before the Deputy Commissioner and at deposition established that before her accident, and throughout her life, plaintiff was a private and independent person; that her overall medical condition has now improved; that she now wishes to live independently outside her mother's home, just as she did prior to her injury; that she has a strong need for the greater privacy that her own accessible housing would provide; and that living in her own accessible home will further her rehabilitation efforts and improve her overall physical and emotional health.
45. Plaintiff's medical condition arising from her compensable catastrophic injuries requires that she live in a home that is accessible for her and her wheelchair; equipped to meet her medical need for a living environment accommodative of her need for privacy and independence and which permits her to live in reasonably close proximity to Wake Medical Center, her doctors, her family and other community resources. Such housing must include each of those architectural or home environment components specified in Finding of Fact No. 43 above. The report submitted by Brenda Alexander of Carolina Case Management 
Rehabilitation Services, Inc., includes as an option an apartment at Walnut Ridge Complex, which is located close to Wake Medical Center and plaintiff's current residence. The apartment complex is new and has both two and three bedroom handicap units. The handicap units do not have covered parking or an attached garage. Also, the Full Commission has no information about wheelchair accessibility related to outside parking at Walnut Ridge Complex. The rental apartment living option presented by defendants could meet plaintiff's needs and would be an acceptable solution to plaintiff's living requirements on a short-term basis if the basic architectural requirements of the Life Care Plan were met. Should plaintiff determine that she wishes to purchase a private home, defendants would remain responsible for adapting the home to plaintiff's needs; however, since plaintiff needs independent living arrangements now, the apartment solution appears to be the better solution currently.
46. Plaintiff's medical needs may also require future medical care, equipment, medication, supplies and attendant care that are presently not known or anticipated by Dr. O'Brien, or that are not now specified in plaintiff's Life Care Plan, or that, though anticipated, cannot be now predicted with sufficient specificity necessary for inclusion in the Life Care Plan. Insofar as the Life Care Plan predicts the future costs of plaintiff's care, those costs are not binding on the Commission. A Life Care Plan's prediction of future medical costs is not intended to and does not bind the parties to pay some fixed or speculative cost. The Life Care Plan's prediction of medical costs is based on the planner's research and expertise respecting the actual medical costs in present day dollars for the applicable items of care, and provides the parties only with information about the potential expense of future care. The Commission is not addressing the issue of future care at this time.
47. Plaintiff's car was destroyed in her work accident. She was making payments on the vehicle and did not receive any compensation for the vehicle from insurance. She does not presently own a vehicle.
48. Because plaintiff's present medical condition includes chronic, severe pain and narcotic medication pain management, and because her doctor has advised against her driving while she is taking pain medication or while experiencing severe pain, plaintiff requires attendant-driven, accessible transportation for all appointments outside her home. Because of the problems posed by transferring plaintiff from her wheelchair to a car, such transportation must be provided in accordance with Dr. O'Brian's recommendation by using a specially equipped, accessible van.
49. Defendant is presently providing accessible transportation services to plaintiff, but only to and from plaintiff's appointments with her health care providers. Defendant earlier provided such transportation to plaintiff's community activities such as church, Bible study, hair appointments and the grocery store.
50. Defendant, at or near the time of hearing before the Deputy Commissioner, terminated its special transportation services to all of Plaintiff's community activities other than doctor appointments. After defendant's termination of its special transportation services, plaintiff's medical condition worsened. This termination of services, in combination with the inaccessibility of her living conditions, necessarily resulted in plaintiff spending more time in her bed, and becoming less active and at a higher risk for medical complications.
51. Transportation to and from community activities has been recommended by Dr. O'Brian and Dr. Zarzar as medically necessary to prevent a further decline in plaintiff's physical and psychological health. Plaintiff needs special transportation services at a minimum to transport her to church, the grocery store, pharmacy/drug store, community support services and to other places to obtain necessary personal supplies and services.
52. On 10 September 2001, plaintiff filed a Motion to Compel Defendants to Authorize and Provide Plaintiff With Certain Special Transportation Services, which essentially asked that defendant be ordered to provide transportation for plaintiff to and from certain of her community activities. On 19 September 2001, defendant filed its response to plaintiff's 10 September Motion, conceding that plaintiff is entitled to additional transportation (other than to medical appointments), but contending that such trips should be limited to those supported by medical evidence. The Commission's ruling on plaintiff's motion is contained hereinafter.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission makes the following additional:
 CONCLUSIONS OF LAW
1. On 17 February 1998, plaintiff suffered an admittedly compensable injury by accident while working for the Defendant.
2. As a result of her compensable accident, plaintiff is permanently and totally disabled in accordance with N.C. Gen. Stat. §§ 97-29 and97-31(17).
3. Because plaintiff is permanently and totally disabled under N.C. Gen. Stat. § 97-29, defendants must authorize and provide workers' compensation benefits, including medical compensation, to plaintiff for the remainder of her life. N.C. Gen. Stat. § 97-29.
4. "Medical Compensation" is defined by the Act as specifically including such "medical, surgical, hospital, nursing, and rehabilitative services, and medicines, sick travel, and other treatment, including medical and surgical supplies, as may reasonably be required to effect a cure or give relief and for such additional time as, in the judgment of the Commission, will tend to lessen the period of disability. . . . N.C. Gen. Stat. § 97-2(19).
5. Under the Act, defendants must provide medical relief to plaintiff that offers "not only an affirmative improvement towards an injured employee's health, but also the prevention or mitigation of further decline in health due to the compensable injury." Little v. PennVentilator Co., 317 N.C. 206, 213, 345 S.E.2d 204, 209 (1986).
6. With respect to any continuing medical, surgical, hospital, or other treatment, the Industrial Commission may order "such further treatments as may in the discretion of the Commission be necessary." N.C. Gen. Stat. § 97-25.
7. It is the province of the Commission to determine in the first instance what medical, surgical, hospital or other treatments, if disputed, are and are not compensable under the Act. N.C. Gen. Stat. § 97-25.
8. The Life Care Plan prepared by Cynthia L. Wilhelm, Ph.D., was medically necessary to evaluate plaintiff `s present and future medical needs resulting from her catastrophic injuries, and to assist the Commission in making specific findings regarding those needs. N.C. Gen. Stat. § 97-25.
9. The Commission does not require or rely upon the Life Care Plan for the purpose of determining which items of care recommended by the Plan and plaintiff's treating physician are legally compensable under the Act. N.C. Gen. Stat. § 97-25.
10. The Life Care Plan's predicted costs for future medical care are not binding on the Commission. Medical costs are determined and approved by the Commission as such costs are incurred, and in accordance with applicable statutes, schedules and rules. N.C. Gen. Stat. § 97-26; Rules 407, 408.
11. Plaintiff's need for each of the items of medical care specified in Finding of Fact No. 39 herein arises from her catastrophic, accident-related injuries, and each of these items of care are medically necessary, reasonably required to effect a cure or provide relief, and compensable under the Act. N.C. Gen. Stat. § 97-25.
12. Plaintiff's need for each of the items of medical adaptive equipment specified in Finding of Fact No. 40 herein arises from her catastrophic, accident-related injuries, and each of these items of care are medically necessary, reasonably required to effect a cure or provide relief, and compensable under the Act. N.C. Gen. Stat. § 97-25.
13. Plaintiff's need for each of the items of medication and medical supplies specified in Finding of Fact No. 41 herein arises from her catastrophic, accident-related injuries, and each of these medications and medical supplies are medically necessary, reasonably required to effect a cure or provide relief, and compensable under the Act. N.C. Gen. Stat. § 97-25.
14. Plaintiff's need for the Attendant/Supportive care specified in Finding of Fact No. 42 herein arises from her catastrophic, accident related injuries, and the care so specified is medically necessary, reasonably required to effect a cure or provide relief, and compensable under the Act. N.C. Gen. Stat. § 97-25.
15. The Commission has entered no Finding of Fact and reaches no Conclusion of Law intended to limit Plaintiff's future medical care, equipment, medications, supplies or attendant care only to those items listed in her Life Care Plan.
16. Under the Act, medical compensation may include alternate, accessible housing for an injured employee. "[A]n employer must furnish alternate, wheel chair accessible housing to an injured employee where the employee's existing quarters are not satisfactory and for some exceptional reason structural modification is not practicable." Dereberryv. Pitt County Fire Marshall, 318 N.C. 192, 203-04, 347 S.E.2d 814, 821
(1986); see also, Timmons v. N.C. Dept. of Transportation,123 N.C. App. 456, 473 S.E.2d 356, 359 (1996) (Timmons I).
17. Modification of Plaintiff's house in Angier, North Carolina is not reasonable, satisfactory or practicable. Modification of the Raleigh house owned by plaintiff's mother is not reasonable, satisfactory or practicable.
18. Defendant must provide plaintiff with alternate, accessible housing that is reasonable, satisfactory and practicable for her circumstances, which in plaintiff's case includes accessible housing accommodative of her special medical needs and her need for independence and privacy, and which permits her to live in reasonable, close proximity to Wake Medical Center, her doctors, her family and other community resources.Dereberry, supra; Timmons I, supra. A rental apartment that complies with the architectural accommodations identified in the Life Care Plan would meet plaintiff's current needs, is an acceptable short-term solution to plaintiff's living requirements, would give all parties an opportunity to monitor plaintiff's ability to live independently and would aid the parties in their subsequent evaluation of the feasibility and cost effectiveness of other housing options, including home ownership.
19. Under the Act, medical compensation may include the provision of sick travel or special adaptive equipment necessary to modify an injured worker's vehicle to accommodate his or her special medical needs arising from the compensable accident. N.C. Gen. Stat. §§ 97-2(19) and 97-25;McDonald v. Brunswick Electric Membership Corp., 77 N.C. App. 753, 756,336 S.E.2d 407, 409 (1985).
20. Defendants are responsible for providing accessible transportation services to plaintiff for such reasonable appointments outside her home to which she might otherwise have driven herself but for her compensable injuries, and as may be medically necessary to effect a cure or provide relief, including any trips or appointments which would tend to prevent or mitigate a further decline in plaintiff's physical or emotional health due to her compensable injuries. Accordingly, plaintiff is entitled to the following transportation for attendant/supportive care to be provided by defendants: (1) all trips to and from all appointments related to plaintiff's medical treatment; and (2) in addition to medical transportation, general transportation for up to 12 hours per week for personal needs, including church, grocery and necessaries, community contacts, etc. These trips shall be limited to a radius of 50 miles from plaintiff's Raleigh residence. N.C. Gen. Stat. § 97-25; Little v. PennVentilator Co., 317 N.C. 206, 213, 345 S.E.2d 204, 209 (1986).
21. Also, defendants are responsible for providing adaptive modifications and equipment necessary to make any reasonably reliable van plaintiff may purchase accessible and accommodative of her medical needs arising from her compensable injuries. Even with an accessible van, plaintiff may not be able to always drive herself. Therefore, during those times when plaintiff is unable to drive herself, defendants are responsible for the reasonable costs of hiring a driver to transport plaintiff to medical appointments and for an addition 10 hours per week to take care of living necessities and needed supportive services as set forth above. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall continue to provide plaintiff with workers' compensation benefits, in the form of permanent and total disability compensation, at the rate of $418.67 per week, for the remainder of her life. Said provision of workers' compensation benefits shall also include medical compensation for the remainder of plaintiff's life.
2. As a part of defendants' obligation to provide medical compensation to plaintiff, defendants shall provide plaintiff with at least each of the items of medical care specified in Finding of Fact No. 39 herein.
3. As a part of defendants' obligation to provide medical compensation to plaintiff, defendants shall provide plaintiff with at least each of the items of medical adaptive equipment and the replacement and maintenance of same specified in Finding of Fact No. 40 herein.
4. As a part of defendants' obligation to provide medical compensation to plaintiff, defendants shall provide plaintiff with at least each of the items of medication and medical supplies specified in Finding of Fact No. 41 herein.
5. As a part of defendants' obligation to provide medical compensation to plaintiff, defendants shall provide plaintiff with at least each of the items of Attendant/Supportive care specified in Finding of Fact No. 42 herein.
6. As a part of defendants' obligation to provide medical compensation to plaintiff, defendant shall provide plaintiff with accessible housing which accommodates her special medical needs and includes at least each of those architectural or home environment components specified in Finding of Fact No. 43 herein, which meets her needs for independence and privacy, and which permits her to live in reasonably close proximity to Wake Medical Center, to her doctors, and to her family and other community resources. Compliance with this Award provision shall not include accommodations to the home owned by plaintiff's mother, or accommodations to the home owned by plaintiff in Angier; however, a rental apartment option which complies with the housing requirements of the Life Care Plan and the other considerations outlined in Finding of Fact # 45 would provide a short-term solution to plaintiff's housing needs while allowing the parties time to evaluate other options. Should plaintiff eventually purchase her own home, defendants shall be required to pay for modifications to that home in compliance with this Opinion and Award.
7. Defendants shall provide to and install for plaintiff adaptive equipment necessary to modify a vehicle that she purchases. Until such time as plaintiff purchases her own means of transportation, defendants shall provide to plaintiff attendant-driven, accessible transportation to and from all appointments related to plaintiff's medical treatment. In addition to medical transportation, defendants shall provide plaintiff with general transportation for up to 12 hours per week for personal needs, including church, grocery shopping, community support services, community contacts and other places to obtain necessary personal supplies and services. These trips must be limited to a radius of 50 miles from plaintiff's Raleigh residence.
8. Defendants shall pay the costs of this action.
This the ___ day of March 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER